THE AMERICAN NATIONAL RED CROSS, A CORPORATION CHARTERED BY THE UNITED STATES CONGRESS, THE RIDGEWOOD NEW JERSEY CHAPTER OF THE AMERICAN RED CROSS, AN UNINCORPORATED ASSOCIATION, RIDGEWOOD RESIDENTS ASSOCIATION, AN UNINCORPORATED ASSOCIATION, JOSEPH A. DONOVAN, FRANK H. JOHNSON, STEPHEN KUNO, RICHARD A. PARSEKIAN, THOMAS RUSHEN, GORDON SHELLARD, KATHRYN STREETER, WILLIAM WARD AND DOROTHY G. WRAY, PLAINTIFFS-APPELLANTS, v. SHOTMEYER BROTHERS, INC., A NEW JERSEY CORPORATION, ALBERT R. GUDRIAN, ACTING SUPERINTENDENT OF BUILDINGS OF THE VILLAGE OF RIDGEWOOD, AND HOMER G. MacVEAN, FRANKLIN B. REINAUER AND ROBERT OLSON, MEMBERS OF THE BOARD OF COMMISSIONERS OF THE VILLAGE OF RIDGEWOOD, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 9, 1961—Decided November 22, 1961.

438

Before Judges GAULKIN, KILKENNY and HERBERT.

*Mr. Burrell I. Humphreys* argued the cause for appellants (*Messrs. Hoffmann & Humphreys,* attorneys).

*Mr. Howard Stern* argued the cause for respondent Shotmeyer Brothers, Inc. (*Messrs. Hofstra & Hofstra,* attorneys).

*Mr. John W. Griggs* appeared for respondents Gudrian, MacVean, Reinauer and Olson (*Messrs. Morrison, Lloyd & Griggs,* attorneys; *Mr. Bruce M. Ramer,* on the brief).

The opinion of the court was delivered by

HERBERT, J. S. C. (temporarily assigned). The plaintiffs sued in the Chancery Division to enjoin the defendant Shotmeyer Brothers, Inc. from constructing a gasoline station in Ridgewood, Bergen County. After trial a final judgment was entered denying injunctive relief and this appeal by the plaintiffs followed. Although The American National Red Cross and The Ridgewood Chapter of The American Red Cross have, since the appeal was taken, with-

drawn from participation, no question has been raised about the standing of the other plaintiffs to go forward.

The gasoline station—which has now been built—is next door to a building at 74 Godwin Avenue owned by The American National Red Cross. Do the activities carried on at the Red Cross building and features of that structure make the Shotmeyer station illegal under Ridgewood's zoning ordinance? That is the basic question on this appeal, as it was in the court below.

Section 15 of the ordinance reads in part as follows:

"(c) *Public Garages, Filling and Service Stations:*
※　　　※　　　※　　　※　　　※　　　※　　　※　　　※

(2) No part of any filling station, bus terminal, or public garage accommodating more than five motor vehicles, nor any driveway, entrance or exit to or from the same, shall be within 300 feet of any lot line of any plot on which is located any building used as a theatre, auditorium, or other place of public assembly seating over one hundred persons, or used as a church, hospital, college, school, or institution for dependents or children, or any public playground or athletic field."

The gasoline station is only about 35 feet from the Red Cross building. But is that building, within the terms of the ordinance, used as a "place of public assembly seating over one hundred persons, or used as a ※ ※ ※ hospital, college, school ※ ※ ※"? We have not been referred to any definitions or declaration of standards in the zoning ordinance which will help to answer this question, so the solution of the problem must be found outside of the ordinance itself.

At the trial the plaintiffs showed that the Red Cross building had been acquired in 1942. It was originally built as a three-story frame residence containing about 14 rooms. Then it was used for a restaurant. After purchase by the Red Cross it was remodeled. Testimony of the president of the Ridgewood chapter showed current use of the building by the Red Cross for a number of its activities and by some unrelated organizations, *e. g.,* Gray Ladies, Nurses Aides, Braille Committee, first aid classes,

Junior Red Cross, Home Nursing Service, Nightingales, Community Chest fund meetings, Girl Scout meetings, American Cancer Society, Visiting Nurse Service, American Heart Fund, and a few others. On the first floor is an assembly room and there are committee rooms on the second and third floors. The basement is used by the Community Thrift Shop.

The chapter president also said that when there is need all the available chairs in the building—including a stock of folding ones—can be placed in the first floor assembly room to give it a seating capacity of 125. He and other witnesses testified to a number of meetings in the room at which about 125 people were present. It was also shown that on occasion several meetings have been conducted simultaneously in separate rooms of the building, attended by an unspecified number of people.

When application was made for a building permit for the gasoline station Mr. Gudrian, the acting building inspector of Ridgewood, examined the Red Cross building. He took measurements and prepared a written report which was marked in evidence. It reads:

"RED CROSS BUILDING—GODWIN AVENUE

a. *The Basement Area* is occupied by the Thrift Shop, which retails used clothing and other items. Area open to the public is 937 square feet. The maximum number of occupants allowed for this area is 30.

b. *The First Floor* is occupied by the Red Cross. The area of the Assembly Room is 696 square feet and the maximum number of occupants allowed for this area is 46.

The offices adjoining the Assembly Room have an area of 589 square feet and the maximum number of occupants allowed for this area is 6.

The kitchen has an area of 281 square feet and the maximum number of occupants allowed for this area is 10.

The total occupancy allowance for the first floor is 62.

c. *The Second Floor* is used for office space of Nursing Services, Inc., Community Chest, Junior Red Cross and Social Service.

The total office area is 1085 square feet and the maximum number of occupants allowed for this area is 10.

The conference room on this floor has an area of 200 square feet and the maximum number of occupants allowed for this area is 13.

The total occupancy allowance for the Second Floor is 23.

d. *The Third Floor* has a large room which is used as a class room. The area amounts to 505 square feet and the maximum number of occupants allowed is 12.

Albert H. Gudrian."

Mr. Gudrian's conclusions about the number of occupants allowed are based upon the Ridgewood building code adopted in 1957, which incorporates by reference, as permitted by *L.* 1948, *c.* 276, *p.* 1179, *N. J. S. A.* 40:49–5.1, *the Abridged Building Code of the Building Officials Conference of America, Inc.* This municipal legislation defines "occupancy load" as "The number of individuals normally occupying the building or part thereof, or for which the exit facilities have been designed." Then in following sections the number of required exits from a building is fixed in accordance with a table entitled "Occupancy Allowances." For example, the floor space allowed by the table for each occupant in an assembly room without fixed seats is 15 square feet, and for each occupant in a business building is 100 square feet. Various floor areas for other types of usage are set out in the table.

■ No contention is made that Mr. Gudrian's measurements or calculations are wrong mathematically. It is argued for the plaintiffs, however, that the plain meaning of the zoning ordinance cannot be changed by a building code adopted at a later date; that the space allowances per person found in the building code are not fixed requirements, but only "normal" figures to be used as guides for determining the number of exits a building must have; and that in any event the Red Cross building, having been in existence when the building code was adopted, is exempted from the effect of the occupancy allowance table. Considering these arguments, our first conclusion is that the reference in the zoning ordinance to "any building used as a theatre, auditorium, or other place of public assembly seating over one hundred persons" is not so clear that a public official can apply it in a mechanical way. The

quoted language requires reasonable and practical interpretation. Almost any building can, by crowding collapsible chairs into available space, be used to seat over 100 persons, but the use of such a standard was not intended, and would not be justified by the zoning ordinance. And what about the frequency of the use? Can it be said with finality that a single public assemblage of more than 100 seated people, or even an occasional assemblage of that size, should be enough to bar a gasoline station on the lot next door? These are questions in our judgment which an administrator could not answer from the zoning ordinance alone.

In *Offhouse v. State Board of Education,* 131 *N. J. L.* 391, 395 (*Sup. Ct.* 1944), a well-established rule of construction was stated:

"Contemporary exposition may be considered, and is ordinarily accorded great weight, where the language of a municipal regulation is of doubtful import and is not made plain by the context. The meaning attributed to the rule soon after its adoption by the authority charged with its enforcement is generally the best construction; and it will be accepted unless clearly wrong, especially where it has received the acquiescence of those affected by its terms. And a local or special act may be practically construed by the parties for whose purposes it was enacted, so as to induce an acceptance of their interpretation without reference to the length of the time covered by such practical construction. *Lewis' Sutherland Statutory Construction* 2d *Ed.,* § 472."

To the same effect see *De Vita v. Housing Authority of City of Paterson,* 17 *N. J.* 350, 357 (1955), and *Weinacht v. Board of Chosen Freeholders of Bergen County,* 3 *N. J.* 330, 335 (1949); *cf. Loveladies Property Owners Assn. v. Barnegat City Service Co., Inc.,* 60 *N. J. Super.* 491, 504 (*App. Div.* 1960), certification denied 33 *N. J.* 118 (1960).

Although the portions of the building code of Ridgewood which are before us do not appear to *prohibit* a public assemblage if the persons in attendance have less than 15 square feet of floor space about their respective movable chairs, we cannot say that the acting building inspector erred when he used the code's table of occupancy allowances

as a municipal standard in the application of the zoning ordinance.

It is clear from the record that the Red Cross building *can* be used for a public assemblage of more than 100 seated persons, or for two or more simultaneous assemblages having a grand total of over 100 in attendance. It is equally clear that such usage has been infrequent and cannot be described as usual or normal. The plaintiffs' brief only points to "at least six different occasions" when the assembly room on the first floor served such a large group. It would not be a reasonable interpretation of the zoning ordinance to hold that mere space for 101 chairs —with some crowding—in the assembly room, or the possibility of public meetings in rooms not equipped or used ordinarily for that purpose, will make the Red Cross building a "place of public assembly seating over one hundred persons," especially when the municipality has adopted what appears to be a sensible test or standard by defining in the building code "occupancy load" as noted above, and by setting up a table of "occupancy allowances" to which those parts of the building used for meetings cannot conform unless the attendance is kept well below 100.

In addition to the report and testimony of the acting building inspector, the defendant called as a witness Harold J. Comerro, a registered architect. He had examined and measured the assembly room on the first floor of the Red Cross building and testified that it contained about 696 square feet of usable floor area. He determined that it, "for reasons of exiting, egress and safety would probably take about 75 chairs," and commented further that accepted architectural standards and the *National Building Code* "say that you should have about 15 square feet per chair in the area of your room." His estimate of 75 chairs was much more favorable to the plaintiffs than the result to be obtained by a literal application of the 15 foot allowance, but still fell far short of the 125 chairs which we are asked to accept as the seating capacity of the room

within the meaning of the zoning ordinance. This testimony from an architect supports the conclusion that the acting building inspector ruled sensibly and properly when he determined that the Red Cross building was not, under the zoning ordinance, a "place of public assembly seating over one hundred persons."

The plaintiffs' argument that the Red Cross building is used as a school depends upon the fact that various Red Cross classes are regularly conducted there, lectures are occasionally given in the assembly room, and a third floor room is designated a "classroom." No definition or standard in the zoning ordinance which will solve the "school" problem has been pointed out. Giving instruction to individuals or groups in a building used principally for other purposes does not make a school, and here it is plain that the classes conducted and lectures given have not been the primary use to which the building has been put. The existence of a "school" within the meaning of the zoning ordinance has not been established.

The plaintiffs' claim that the Red Cross building is a "hospital" rests on weaker facts than the argument for a school. It was testified that in times of disaster the structure would be used as a headquarters to aid victims. Hospital beds, wheel chairs, crutches and other aids and supplies for the injured and sick are kept on hand and are loaned to residents of the area. Polio clinics to give inoculations have at times been operated in the building and courses on home nursing and for hospital aides have been conducted there. These valuable community activities, conducted as they are in a building used primarily for other purposes, do not in our view create a "hospital" within the meaning of the zoning ordinance.

Two other points urged for the plaintiffs remain. It was not error, as they contend, to exclude testimony from one of the drafters of the *Abridged Building Code of The Building Officials Conference of America, Inc.* about the intended meaning of that code. *Bass v. Allen Home*

*Improvement Co.*, 8 *N. J.* 219 (1951) and *Town of West Orange v. Jordan Corp.*, 52 *N. J. Super.* 533, 546 (*Cty. Ct.* 1958). In the first of these cases it was held error to receive testimony from the legislator who had introduced the bill which became the law which the court was interpreting.

■ As to the trial court's ruling which dismissed from the case the municipal officials who are the individual defendants, we find merit in the plaintiffs' argument that the dismissal should not have been ordered. The ground for dropping the officials from the case was that they should have been sued in the Law Division in an action in lieu of prerogative writ. In *O'Neill v. Vreeland*, 6 *N. J.* 158, 169 (1951), the court said:

"No action is to be dismissed merely because it has been brought in or transferred to the wrong division."

Combining in a single suit a claim for injunctive relief with one properly asserted by an action in lieu of prerogative writ has been approved. *Dolan v. De Capua*, 16 *N. J.* 599, 613 (1954); *Garrou v. Teaneck Tyron Co.*, 11 *N. J.* 294, 304 (1953). An order of transfer to the Law Division might have been appropriate (*R. R.* 4:88–2), but not a dismissal.

■ The contention made by the defendant officials that the appeal is out of time as to them, has no more merit than their argument that the only proper way to sue them is in the Law Division by action in lieu of prerogative writ. They say that time for appeal against them should be calculated from the date of the order dismissing them from the case, rather than from the date of the final judgment. That is not so. Under *R. R.* 4:55–2 the order did not terminate the action as to the officials since it lacked an express determination that "there is no just reason for delay" and contained no express direction for the entry of judgment. See *Petersen v. Falzurano*, 6 *N. J.*

447 (1951), and *Mortgage Corporation of N. J. v. Aetna Casualty & Surety Co.,* 19 *N. J.* 24, 27 (1955).

However, because we have determined to affirm the judgment of the Chancery Division in favor of the defendant Shotmeyer Brothers, Inc., the dismissal of the public officials from the case and the timing of the appeal on that dismissal are academic matters, involving no possibility of prejudicial error. We mention them only to eliminate any inference that on important procedural points we agree with arguments which we consider unsound.

The judgment is affirmed.